UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JESSE MURRAH                                                                    PLAINTIFF

vs.                                                             NO. 3:18-CV-217-CRS

TDY INDUSTRIES, LLC                                             DEFENDANT

<u>MEMORANDUM OPINION</u>

This matter is before the Court on Defendant TDY Industries, LLC's ("TDY's") motion for summary judgment under Federal Rule of Civil Procedure 56. DN 73. Plaintiff Jesse Murrah ("Murrah") filed a response, DN 74, and Defendant replied. DN 76. This matter is now ripe for adjudication. For the following reasons, Defendant's motion will be granted by separate order.

I. BACKGROUND

This case arises from a single-vehicle accident in which a tractor trailer driven by Plaintiff overturned while rounding a curved interstate ramp in Louisville, Kentucky on February 23, 2017. DN 74 at 1; DN 73-1 at 1. Plaintiff was hauling eleven metal containers of steel wingnuts, which were manufactured and packaged by Defendant, weighing a total of 32,758 pounds and each container measuring about three feet by four feet at the base and standing approximately three feet tall. DN 74 at 1; DN 73-7 at 3. Murrah had picked up the cargo at Defendant's facility in Lebanon, Kentucky and was in the process of transporting it to Pontiac, Michigan at the time of the accident. DN 73-1 at 1. In accordance with Defendant's loading procedures, the materials were loaded onto Murrah's trailer by an employee of TDY without any assistance from Plaintiff. DN 76-2 at 3; DN 73-3 at 4. Plaintiff states that he "observed the the [sic] materials were placed from front to back, but were centered in the middle of the tractor trailer, instead of being distributed from left to right."

1

DN 76-2 at 3. The containers were not secured in any way by Defendant. DN 73-5 at 3. Murrah's inspection of the load occurred "from the ground, looking into the bed of the trailer." DN 74. In the complaint and in discovery responses, Plaintiff attests that he was concerned about how the materials were loaded. DN 1-2 ¶ 9; 76-2 at 3. However, in his response, Plaintiff states that "there was nothing particularly unusual about the load." DN 74 at 7–8. Plaintiff did not discuss any concerns about the load to TDY's employees or request any load adjustments. DN 73-1 at 6.

At the time in question, Plaintiff was an independent contractor driving commercial tractor trailers for the carrier C.W. Express, LLC. DN 73-1 at 1. A brokerage agreement that both parties agree applies to the events in this case states that "[u]nless access is prohibited, Carrier assumes all responsibility for the placement, securement and transportation of commodities being shipped and for training its drivers to insure that the placement, securement and transportation of commodities is performed in compliance with all federal, state and local laws and regulations." DN 73-4 at 3. In addition, it states that "Shipper agrees that Carrier has the right to request any load adjustments." *Id.*

Murrah brought this action in Kentucky state court on December 1, 2017, alleging that TDY was negligent in loading the materials onto Plaintiff's trailer. DN 1-2. Plaintiff alleges that Defendant's negligent loading caused the materials to shift while rounding the interstate ramp, which caused the trailer and, consequently, the truck to which it was attached to overturn. *Id.* at ¶ 12. The complaint seeks compensatory as well as punitive damages. Defendant removed the case to federal court on April 9, 2018 on grounds of diversity jurisdiction. DN 1-1. After completion of discovery, Defendant filed the present motion for summary judgment. DN 73.

## II. LEGAL STANDARD

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Such an absence may be shown "by demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Ford v. GMC*, 305 F.3d 545, 551 (6th Cir. 2002). "In response, the nonmoving party must present 'significant probative evidence' to show that 'there is [more than] some metaphysical doubt as to the material facts.'" *Id.* (quoting *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993) (alteration in the original)). A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). Additionally, the Court must draw all factual inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. ANALYSIS

For a negligence claim to succeed under Kentucky law, a plaintiff must prove "(1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). Defendant argues that it is entitled to summary judgment because it owed no duty of care to Plaintiff to ensure the safety of the load. DN 73-1 at 7. Whether a duty exists is a question of law to be determined by the court. *Pathways, Inc.*, 412 S.W.2d. at 89. Defendant claims that federal regulations and case law "expressly place the responsibility squarely upon Plaintiff, as the driver for the Carrier, to ensure proper placement and securement of the load prior

3

to transport." DN 73-1 at 7–8. Therefore, Defendant argues, "[p]laintiff's duties supersede any allegations of negligence on the part of TDY." *Id.* at 8.

Defendant points to certain regulations promulgated under the Federal Motor Carrier Safety Act ("FMCSA"). These regulations apply to carriers and not shippers. 49 C.F.R. § 390.3(a) (applying to "all employers, employees and commercial vehicles, which transport property or passengers in interstate commerce"). They provide that "[a] driver may not operate a commercial motor vehicle . . . unless . . . [t]he commercial motor vehicle's cargo is properly distributed and adequately secured" in accordance with the technical specifications of the chapter. 49 C.F.R. § 392.9(a). Specifically, "[c]argo must be contained, immobilized or secured . . . to prevent shifting upon or within the vehicle to such an extent that the vehicle's stability or maneuverability is adversely affected." 49 C.F.R. § 393.100(c). Defendant argues that these regulations alone establish that it owed no duty to Plaintiff to properly load or secure the materials. DN 73-1 at 8–9. The Sixth Circuit has noted that the FMCSA regulations, in general, are "indicative of the proper allocation of duty as between a common carrier and a shipper for the proper loading of goods." *Rector v. Gen. Motors Corp.*, 963 F.2d 144, 147 (6th Cir. 1992). However, although the FMCSA regulations do place a nondelegable legal duty on drivers to ensure proper load placement and securement, it does not follow that shippers are absolved of all duty to the driver when the shipper assumes the responsibility of loading the cargo, as is the case here. *See Pierce v. Cub Cadet Corp.*, 875 F.2d 866, 1989 U.S. App. LEXIS 14626, *9 (6th Cir.1989) ("Only if and when a shipper assumes the responsibility for loading its property on a motor vehicle, does it have the duty to exercise reasonable care to see that the load is properly secured.").

When the shipper assumes the responsibility of loading the cargo, "the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by

4

ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper." *United States v. Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir. 1953). The so-called "*Savage* rule" has been accepted by most federal and state courts. *Decker v. New England Pub. Warehouse, Inc.*, 749 A.2d 762, 767 (Me. 2000) ("Most courts now accept the rationale of Savage and require carriers to take responsibility for the loads they carry even if those loads have been improperly loaded by others."); Kucharski v. Orbis Corp., No. 14-cv-05574, 2017 U.S. Dist. LEXIS 68611, at *28 n.2 (N.D. Ill. May 5, 2017) (collecting cases that "have either explicitly applied the Savage rule or utilized rationale embodied in the Savage rule"). The Sixth Circuit has stated in an unpublished opinion that the rule "comports with Kentucky's jurisprudence on negligence and contributory negligence." *Pierce*, 875 F.2d 866, 1989 U.S. App. LEXIS 14626, *9. Likewise, it has also been applied by the Court of Appeals of Kentucky in an unpublished opinion. *Musial v. PTC All. Corp.*, Nos. 2011-CA-001365-MR, 2011-CA-001481-MR, 2012 Ky. App. Unpub. LEXIS 639, at *19 (Ky. Ct. App. Aug. 24, 2012). Therefore, since Kentucky's highest court has not spoken directly on the issue of what duty a shipper owes to a carrier when it assumes the responsibility of loading cargo, the Court will apply the *Savage* rule in this case. *See Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) ("Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)).

  Because it is undisputed that TDY loaded the cargo into Plaintiff's trailer on the day at issue, Defendant can only be liable for latent defects in the loading that would not have been apparent to Murrah upon ordinary observation. *Savage Truck Line, Inc.*, 209 F.2d at 445. Thus, to survive summary judgment, Plaintiff must present evidence that a triable issue of fact exists as

5

to whether a latent defect in TDY's loading of the materials caused his injuries. As discussed below, plaintiff has not met this burden.

Courts applying the *Savage* rule have looked at two factors in deciding whether a latent defect exists: the driver's level of experience and whether any assurances were given to the driver by the shipper regarding the safety of the load. *See, e.g.*, *Aragon v. Wal-Mart Stores E., LP*, 735 F.3d 807, 810 (8th Cir. 2013); *Vargo-Schaper v. Weyerhaeuser Co.*, 619 F.3d 845, 849 (8th Cir. 2010). These factors go toward assessing the risk that should have been apparent to the driver upon inspecting the load. *See Aragon*, 735 F.3d at 810. "It stands to reason drivers with more experience are more capable of detecting loading defects than those without experience." *Vargo-Schaper*, 619 F.3d at 849. In addition, reasonable reliance on assurances from the shipper, who is familiar with the materials themselves and with loading them, may conceal what would otherwise be an obvious defect. *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 221–222 (3d Cir. 2010).

For instance, in *Franklin Stainless Corp. v. Marlo Transport Corp.*, the Fourth Circuit noted that although the loading of metal coils down the center of the trailer by the shipper without any type of securement was, of course, apparent to the driver upon visual inspection, "[i]t does not follow, however, that the defect in this manner of loading was open and obvious." 748 F.2d 865, 868 (4th Cir. 1984). The court arrived at this conclusion because the driver had told the shipper that he had never hauled steel coils before, to which the shipper replied with assurances that the loading method was safe. *Id.* at 866, 869. *See also Syngenta Crop Prod. v. Doyle Brant, Inc.*, No. 3:06-CV-84-S, 2008 U.S. Dist. LEXIS 3492, at *11–12 (W.D. Ky. Jan. 15, 2008) (finding an issue of fact to exist regarding whether defect in loading was latent because the driver testified he had never hauled the type of container at issue and the shipper gave assurances that the load would not shift).

However, in *Decker v. New England Public Warehouse, Inc.*, the court held that an unsafe loading configuration was not latent. 749 A.2d at 768. The court explained that in addition to the plaintiff being "an experienced driver for an established carrier," he only inspected the cargo from ground level and assumed the load configuration to be safe. *Id.* at 767–68. The driver's inspection should have revealed an unsafe configuration, the court reasoned, adding that "[a]n inadequate inspection does not force liability onto the shippers." *Id.* at 768. Likewise, in *Vargo-Schaper v. Weyerhaeuser Co.*, the court held that there was no latent defect in the loading of bundles of cardboard boxes because any "crowning" effect, which would have resulted in instability of the load, "would have been visible upon inspection." 619 F.3d at 850. The court found that the two factors discussed above did not apply because the driver had "years of experience" driving tractor trailers, including handling loads for the shipper whose cargo was involved in the accident at issue in the case, and there was no evidence of any assurances given by the shipper regarding the safety of the load. *Id.*

In this case, Plaintiff has failed to show any evidence that his alleged damages were the result of a latent defect in Defendant's loading of cargo onto his trailer. To begin, the Court notes that it is unclear from his response what Plaintiff believes the alleged defect was that caused his accident. The complaint alleges that Defendant "placed large metal material for shipment along the middle of the tractor, doing nothing to ensure that the material could not shift while in transit." DN 1-1 ¶ 8. Then, Plaintiff mentions in his response, but does not cite to or attach as an exhibit, a statement from Plaintiff's expert report that the loading of the containers single file down the middle of the trailer was improper because "the load was not centered between the fifth wheel of the truck and the rear axel tires," creating an "unbalanced load." DN 74 at 2; DN 50-1 at 23. The report stops short of stating that the load being unbalanced in this way is what caused the load to

7

shift and thereby cause the rollover. *See id.* at 23–24. Instead, the report continues, stating that "there was no reason for the containers to shift to the left unless they were loaded incorrectly, to the left of the centerline of the trailer, front to back."[1] *Id.* at 24. These two statements appear to conflict as to the alleged incorrect loading method. However, drawing all inferences in favor of the nonmoving party, the Court will assume that not centering the load between the fifth wheel of the truck and the rear axel tires and the containers being loaded to the left of the centerline of the trailer are both potential theories of the alleged defect that caused the rollover. In addition to the load configuration, Plaintiff also suggests that the lack of securement, such as strapping, was a defect that caused the rollover. DN 74 at 2. In his response, Plaintiff cites to the deposition of one of TDY's employees who responded in the affirmative when asked if driving with the containers unsecured by straps was a dangerous thing to do and whether it could cause a truck to overturn. *Id.*; DN 74-2 at 2–3.

No matter which theory Plaintiff relies on, he has put forward no evidence that any of these potential defects were latent. Although he had never previously transported cargo for Defendant, Plaintiff describes himself as an experienced driver who knew his responsibilities. DN 76-1 at 2–3, 6. He also states in his deposition that he began learning about proper loading techniques while working for a furniture company in the 90s, the time at which he also began training for his CDL license. *Id.* 2–3. In addition, Plaintiff offers no evidence that Defendant gave any assurances regarding the safety of the load. The complaint alleges that "Plaintiff remarked at the placement

---

[1] The report states:

> The evidence indicates that there was no reason for the containers to shift to the left unless they were loaded incorrectly, to the left of the centerline of the trailer, front to back. . . . This rollover was caused by the loaded [sic] moving to the left side of the trailer and causing the right-side trailer tires to lose contact with the ground.

DN 50-1 at 24.

8

of the material, but Defendant's employees remarked that this was normal." DN 1-2 ¶ 9. However, Plaintiff has not proven this assertion through the discovery process. Since neither of the above factors weigh in favor of the Plaintiff, there is no way for Plaintiff to prove that the load placement or lack of strapping were latent defects that were undiscoverable upon ordinary observation. To the contrary, both the placement of the cargo and the lack of securement were open and obvious. Plaintiff "had the opportunity to inspect the cargo and assure himself that it was properly distributed and adequately secured, as he was required to do under the [FMCSA] Safety Regulations." *Aragon*, 735 F.3d at 812. Plaintiff's failure to appreciate the risks of transporting the cargo, when the load placement and lack of securement were open and obvious to him, does not transfer responsibility onto Defendant.

Yet, Plaintiff insists that "there is a genuine issue of material fact as to whether the defect in Defendant's loading was apparent." DN 74 at 6. He states in his response that "there was nothing particularly unusual about the load" and that he "relied on the knowledge of the shipper." *Id.* at 8. Plaintiff claims this was reasonable to do, citing Defendant's expert as stating that "the friction of the metal tub and the wood floor could be sufficient," and that additional securement may be unnecessary in some circumstances. *Id.* at 8. However, the *Savage* rule does not consider the reasonableness of the driver's belief regarding the safety of the load when that belief is not based on assurances from the shipper. *See Franklin Stainless Corp.*, 748 F.2d at 869. The driver has the primary obligation to know how to properly distribute and secure the load he is transporting and to ensure that both are accomplished. *Savage Truck Line, Inc.*, 209 F.2d at 445 ("The primary duty as to the safe loading of property is therefore upon the carrier."); 49 C.F.R. §§ 392.9(a), 393.100(c); DN 73-4 at 3. This remains the case even if the driver mistakenly assesses the safety of the load. *See Decker*, 749 A.2d at 768. Plaintiff saw how the cargo was loaded and had a right,

as well as a duty under FMCSA regulations, to request an adjustment. DN 73-4 at 3 ("Shipper agrees that Carrier has the right to request any load adjustments."); 49 C.F.R. §§ 392.9(a), 393.100(c). The fact that Plaintiff "lacked the requisite knowledge to request a load adjustment," as he claims, was not the fault of Defendant, as any potential defect in Defendant's loading was open and obvious to Plaintiff.

Plaintiff also alleges that Defendant had knowledge that the load was unsafe and would shift, pointing to a statement of one of Defendant's employees that he remembered one rollover incident that happened previously involving the transportation of Defendant's cargo. DN 74 at 7–8. Plaintiff suggests that this statement makes the alleged defect latent because "[o]nly the shippers have the knowledge that . . . [the load] would [shift], and in fact had shifted [previously]." *Id.* at 8. However, this statement of TDY's employee is irrelevant. In addition to the fact that Plaintiff has not proven that such an incident did in fact occur, the employee did not state that the alleged accident was due to a shifting load or that Defendant was in any way responsible. *See* DN 73-5 at 6. Therefore, Plaintiff's arguments fail to establish that there is a genuine issue of material fact regarding whether there was a latent defect in how Defendant loaded Murrah's trailer.

Lastly, Plaintiff points to certain language in the brokerage agreement that he claims places responsibility of Defendant. First, he claims that it limits Plaintiff's ability "to participate in the loading of the trailer" because the agreement states that "drivers are not to remain in the cab of their trucks, nor are they permitted to be on the fiat bed of the trailer during loading or unloading," and that "[d]rivers should be a safe distance from any loading or unloading of material." DN 74 at 8; DN 73-4 at 3. However, this language in no way affected Plaintiff's ability to make an inspection after the loading took place and then to request an adjustment if necessary. The agreement also states that the carrier is responsible for the placement of the load "unless access is

prohibited." DN 73-4 at 3.  Plaintiff claims that his access was prohibited.  DN 74 at 9.  However, nothing in the record indicates that Plaintiff was not allowed access to his loaded trailer once loading was complete.  The loading protocols outlined in the agreement are for the driver's safety and do not amount to a prohibition on access as Plaintiff suggests.

Finally, Plaintiff highlights other language in the agreement as supporting his position.  The agreement states that "Carrier will not be responsible to the extent that employees of the Shipper may assist Carrier's driver with preparing, loading, or securing the commodities to be shipped and are negligent in doing so."  DN 73-4 at 3.  In addition, the agreement provides that the carrier shall be required to indemnify the shipper, "except to the extent of Shipper's negligence."  *Id.*  Plaintiff argues that these provisions "support[] actionability on the part of the Plaintiff against the Defendant shipper here." DN 74 at 9.  This is incorrect.  These provisions only state that the carrier will not be liable to the shipper in certain circumstances.  They do not, however, state that the shipper will be liable to the carrier in those circumstances.  In other words, the language does not overcome the allocation of duties as described in the case law regarding when a shipper is liable to a carrier for its negligent loading.  Therefore, nothing in the agreement alters the above *Savage* rule analysis discussed by the Court.  Plaintiff has failed to present any evidence that his damages were the result of a latent defect in Defendant's loading as he is required to do to survive summary judgment.  As a result, no reasonable jury could return a verdict for Plaintiff.

### IV.  CONCLUSION

For the reasons discussed herein, Defendant's motion for summary judgment, DN 73, will be granted by separate order.

June 15, 2021



Charles R. Simpson III, Senior Judge
United States District Court